

**SO ORDERED.**

**SIGNED this 18 day of June, 2009.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

DESIGNATED FOR PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SUNBELT GRAIN WKS, LLC, | ) | Case No. 08-10204 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| STEVEN L. SPETH, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 08-5112 |
| | ) | |
| WHITHAM FARMS FEEDYARD, L.P., | ) | |
| and SECURITY STATE BANK, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>MEMORANDUM OPINION</u>**

Security State Bank ("SSB") moves for summary judgment on the trustee's complaint against

1

itself and Whitham Farms Feedyard, LP ("Whitham"). The trustee in bankruptcy, Steven Speth, filed an adversary complaint under Fed. R. Bankr. P. 7001(2) seeking a determination of the validity, priority, and extent of defendants' respective interests in certain proceeds from the trustee's sale of debtor Sunbelt Grain WKS, LLC's ("Sunbelt") grain inventory and asserting its 11 U.S.C. § 544 rights as a hypothetical bona fide purchaser. In its answer to that complaint, SSB asserts a perfected security interest in grain inventory that was stored at Sunbelt at the time of commencement of this bankruptcy case and that this interest primes that of Whitham and the trustee. In response, Whitham claims it owned a portion of the corn in the debtor's elevator because it purchased same and prepaid for it. As a buyer in the ordinary course of business, Whitham contends that it prevails over SSB.[1] Whitham also later asserted its priority to the sale proceeds under the doctrine of equitable subordination.[2] The ultimate issues here are (i) whether Whitham has an ownership interest in the corn or is a buyer in the ordinary course of business; and (ii) whether SSB's conduct affords the Court a basis to equitably subordinate its claim below that of Whitham.[3]

Procedural Background

This bankruptcy case was commenced by the filing of an involuntary chapter 7 petition on February 4, 2008. SSB was one of the petitioning creditors. Steven Speth was appointed chapter 7 trustee. After the order for relief was entered on March 5, 2008, the trustee sought and obtained court approval to sell Sunbelt's grain inventory (corn and wheat).[4] Said sale occurred on April 10,

---

[1] KAN. STAT. ANN. § 84-9-320(a) (2008 Supp.).

[2] Adv. Dkt. 33. *See* 11 U.S.C. § 510(c).

[3] *See* Final Pretrial Order, Adv. Dkt. 52.

[4] Dkt. 28 and 47.

2

2008. Thereafter, the Court approved the trustee's disbursement of a portion of the sale proceeds to various open storage holders.[5] SSB and Whitham asserted competing claims to the remainder of the corn sale proceeds held by the trustee, approximately $3.3 million.[6] According to the pretrial order, SSB asserts a claim of $3.2 million as Sunbelt's secured lender and Whitham asserts a claim of $2.19 million for 580,000 bushels of prepaid corn of which only 56,000 bushels were delivered and received.[7]

The trustee commenced the instant adversary on May 29, 2008 to determine these parties' interests in the sale proceeds. Following a period of discovery, SSB filed its motion for summary judgment on the trustee's complaint. The trustee does not contest SSB's motion, leaving Whitham and SSB as the sole parties battling over the sale proceeds.[8] It is undisputed that SSB holds a valid and perfected security interest in Sunbelt's grain inventory, accounts and proceeds thereof.[9] Accordingly, the motion for summary judgment centers on Whitham's ability to establish its ownership of a portion of the corn inventory and its status as a buyer in the ordinary course or the doctrine of equitable subordination, in order to overcome SSB's perfected security interest in the grain.

---

[5] Dkt. 63 and 76.

[6] *See* Dkt. 120.

[7] Sunbelt stopped deliveries of corn to Whitham on or about December 14, 2007 when SSB commenced a state court foreclosure action against Sunbelt. The current principal amount of SSB's claim, after apparently liquidating some of its collateral, is $1,988,733.38 plus accrued interest. SSB contends that it is over secured and entitled to fees and costs. *See* Adv. Dkt. 52, p. 10.

[8] Adv. Dkt. 49.

[9] *See* Pretrial Order, Adv. Dkt. 52, Stipulation ¶s G, H, I, and J.

3

<u>Summary Judgment Standards</u>

This Court's function in reviewing SSB's motion for summary judgment is to first determine whether genuine issues of fact exist for trial. In making this determination the Court may not weigh the evidence nor resolve fact issues.[10] On summary judgment, it is not the Court's function to determine witness credibility, weigh evidence or decide competing inferences.[11] Once the Court determines those facts to which there is no dispute, it must then determine whether those uncontroverted facts establish a sufficient legal basis which entitle the movant to judgment as a matter of law.[12] If different ultimate inferences may properly be drawn from the facts, summary judgment is not appropriate.[13]

Before addressing the specifically numbered paragraphs of the statements of fact, a few general comments are in order regarding Whitham's compliance with summary judgment procedure in purporting to controvert SSB's statement of uncontroverted facts. Whitham's memorandum in opposition to SSB's summary judgment motion contains a three-page "factual narrative."[14] While

---

[10] *First Sec. Bank of New Mexico, N.A. v. Pan American Bank*, 215 F.3d 1147, 1154 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986); *Concrete Works of Colo., Inc. v. City and County of Denver,* 36 F.3d 1513, 1518 (10th Cir. 1994) (Court may not resolve disputed questions of fact at the summary judgment stage).

[11] *Pan American Bank, supra; Masilionis v. Falley's Inc.*, 904 F. Supp. 1224, 1226 (D. Kan. 1995); *Boyer v. Board of County Com'rs of Johnson County,* 922 F. Supp 476, 484 (D. Kan. 1996), *aff'd* 108 F.3d 1388 (10th Cir.1997).

[12] *E.E.O.C. v. Lady Baltimore Foods, Inc.,* 643 F. Supp. 406, 407 (D. Kan. 1986) (Even if there are no genuine issue of material fact, the movant still has the burden to show it is entitled to judgment as a matter of law.); *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002).

[13] *Security Nat. Bank v. Belleville Livestock Commission Co.*, 619 F.2d 840, 847 (10th Cir. 1979).

[14] *See* Adv. Dkt. 51, pp. 2-5.

4

the narrative may be helpful in placing Whitham's position and the chain of events in context, it is devoid of any references to the record and disregards the requirements of D. Kan. LBR 7056(b)(2) and (d). As such, the Court will disregard the narrative in its entirety in deciding whether Whitham has shown the existence of genuine issues of material fact that require a trial.[15] Instead, the Court focuses on Whitham's specific responses to SSB's statement of uncontroverted facts, keeping in mind that the Court disregards those factual disputes that are not material to the outcome[16] and a party's characterization of the facts, whether made by the movant or the non-movant.[17]

Whitham submits the affidavit of its general partner, Stewart Whitham, as the primary means to controvert SSB's statements of fact.[18] Summary judgment affidavits must meet certain requirements.[19] They must be based upon personal knowledge and must contain information

---

[15] *See Bond v. Queen,* 71 F. Supp. 2d 1117, 1119 (D. Kan. 1999); *Joshua W. v. Board of Educ. Of Wichita Public Schools U.S.D. No. 259*, 13 F. Supp. 2d 1199, 1205 (D. Kan. 1998); *Bundren v. Parriott,* 2007 WL 2405258 at *6, 245 Fed. Appx. 822 (10th Cir. Aug. 24, 2007).

[16] *See Cease v. Safelite Glass Corp.*, 911 F. Supp. 477 (D. Kan. 1995) (Only disputes over facts that might affect the outcome under governing law will preclude summary judgment); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (Factual disputes that are irrelevant or unnecessary will not be considered); *Richards v. City of Topeka*, 934 F. Supp. 378 (D. Kan. 1996).

[17] *See Patton v. AFG Industries, Inc.*, 92 F. Supp. 2d 1200, 1202 n. 3 (D. Kan. 2000) (Controversion only denied characterization of a fact [a conversation] and therefore the fact is deemed admitted); *Stephens v. City of Topeka, Kan.,*, 33 F. Supp. 2d 947 (D. Kan. 1999) (Conclusory terms or characterizations without any concrete facts to support characterizations are afforded no weight by the court); *Rogers v. United States*, 58 F. Supp. 2d 1235 (D. Kan. 1999) (The general characterization of a transaction is a question of law).

[18] It does not appear from the record presented to the Court that Mr. Whitham was deposed.

[19] Fed. R. Civ. P. 56(e)(1); D. Kan. LBR 7056(d).

5

admissible at trial.[20] Statements of mere belief are disregarded.[21] An affidavit that purports to testify concerning another party's intent is improper.[22]  The affidavit may not be based upon conclusory statements without specific supporting facts.[23]

The Whitham affidavit suffers from each of these defects. Mr. Whitham states that "[a]ll the facts set forth in this affidavit are based upon my personal knowledge; my review of relevant documents; *my opinion*, based upon my experience and knowledge of the operations of [Whitham and Sunbelt], by virtue of having been one of Sunbelt's major – if not the largest – customers . . ."[24] Yet at another point in his affidavit, Mr. Whitham asserts his "good faith *belief and understanding*" as a basis to conclude that SSB's actions "*appear* to be a contrivance."[25]  Mr. Whitham's affidavit

---

[20]  *Thomas v. International Business Machines,* 48 F.3d 478 (10th Cir. 1995) (Hearsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment.); *Adams v. Allstate Ins.,* 723 F. Supp. 111 (E.D. Ark. 1989) (Affidavit containing parol evidence to contradict a judicial document [Court Clerk's Report of Judicial Sale] is inadmissible and would not be considered in opposing insurer's summary judgment motion.); *Harris v. Siegel,* 438 F. Supp. 510 (D.C. Fla. 1977) (Parol evidence of an alleged oral side agreement between mortgagees and mortgagors that contradicted terms of note and mortgage would not be considered on summary judgment motion.).

[21]  *Argo v. Blue Cross Blue Shield of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006); *Tavery v. United States,* 32 F.3d 1423 (10th Cir. 1994).

[22]  *See Coca Cola Co. v. Overland, Inc.,* 692 F.2d 1250 (9th Cir. 1982) (Employees of bar and restaurant were not qualified to testify what customers were thinking when using the term "Coke.").

[23]  *BancOklahoma Mortg. Corp. v. Capital Title Co., Inc.,* 194 F.3d 1089 (10th Cir. 1999) (Affidavit must set forth facts, not conclusory statements); *Jones v. Denver Post Corp.*, 203 F.3d 748, 756 (10th Cir. 2000) (Co-worker affidavits stating that, in their opinion, plaintiff was subjected to disparate treatment by employer were insufficient to defeat employer's summary judgment motion); *Fitzgerald v. Corrections Corp. of America*, 403 F.3d 1134, 1143 (10th Cir. 2005) (Conclusory affidavit without specific supporting facts has no probative value).

[24]  Whitham Affidavit, ¶ 2 (emphasis added).

[25]  *Id.* at ¶ 30 (emphasis added).

6

contains several instances of hearsay statements attributed to third parties.[26] It purports to state what Sunbelt or SSB intended or knew, matters as to which Mr. Whitham can claim no personal knowledge.[27] It abounds with conclusory statements regarding course of dealing without providing any underlying specific facts or evidence of that alleged course of dealing.[28] Many of Whitham's conclusory statements are legal conclusions prefaced upon that alleged course of conduct and dealings with Sunbelt. For example, he concludes that title to the corn passed upon payment,[29] that delivery costs were included in the prepayment,[30] that the corn was identified to the contract at the time of payment,[31] and that the parties waived the NGFA rules,[32] all based upon the parties' alleged course of dealing while setting forth no specific facts. Some of Whitham's conclusory statements

---

[26] *Id.* at ¶ 40 (hearsay statement of state court receiver, Terry Criss); ¶ 33 (hearsay statement of SSB's president, James Arnold); ¶ 35 (hearsay statement of Sunbelt personnel, Kathy Shafer and Karen Allen); ¶ 42 (The state grain examiner's report confirmed that Whitham's . . . corn was in Sunbelt's inventory."). The Court makes no determination at this stage of the proceedings whether some of these attributed statements are admissible under one of the hearsay exceptions.

[27] *Id.* at ¶ 4 ("Sunbelt was aware and fully expected that Whitham . . . would prepay"); ¶ 5 ("James Arnold, president of Security State Bank, was well aware of the course of conduct and dealing among Whitham . . . and Sunbelt . . ."); ¶ 10 (" . . . the parties intended that the corn be identified . . . at the time of payment"); ¶ 13 (". . . Whitham . . . and Sunbelt waived application of [the NGFA] rules . . ."); ¶ 30 ("Security State Bank waited until Whitham . . . had paid and then acted."); ¶ 31 (". . . James Arnold and Security State Bank were aware that Whitham . . . would be prepaying in November 2007 . . ."); ¶ 37 (SSB "pursued and contacted numerous other local Kansas farmers to sign off on the involuntary petition, none of whom agreed to do so.").

[28] *Id.* at ¶s 3, 4, 10, 13.

[29] *Id.* at ¶s 3, 4

[30] *Id.* at ¶ 6.

[31] *Id.* at ¶ 10

[32] *Id.* at ¶ 13.

lack any evidentiary support whatsoever.[33]  Finally, some of Whitham's statements in his affidavit are simply not material to the outcome.[34]   In summary, very little of the Whitham affidavit is effective to controvert SSB's statement of uncontroverted facts or support Whitham's additional statements of uncontroverted fact because it is made up of largely conclusory statements that lack the necessary supporting *facts* based upon Stewart Whitham's personal knowledge.[35]

Applying the foregoing standards, the Court finds the following facts are uncontroverted.

<u>Uncontroverted Facts</u>[36]

Sunbelt was established in 2006 as an LLC.  Its principals, Jim and Kathy Shafer, have been in the grain business in western Kansas for many years.  Sunbelt operated elevators at various locations in western Kansas.  It purchased grain (corn and wheat) from local farmers for resale to buyers and also maintained open storage operations for grain owned by the producers.  SSB was its

---

[33]  *Id.* at ¶ 11 ("On November 1 and 20, 2007, there was no question that the corn was on hand at Sunbelt's facilities."); ¶ 42 (stating that state grain examiner's report confirmed that Whitham's corn was in Sunbelt's inventory but not attaching an authenticated copy of the examiner's report to his affidavit).

[34]  *Id.* at ¶ 3 (Whitham's course of dealing with Sunbelt Grain, Inc., as opposed to Sunbelt Grain WKS, LLC); ¶ 5 (Arnold's banking relationship with other parties); ¶ 12 (no previous mention of NGFA rules); ¶ 18 (relationship or connection of Kathy Shafer to other entities); ¶ 37 (SSB's pursuit of petitioning creditors for involuntary petition); ¶ 38 (observations at deposition of Kathy Shafer); ¶ 40 (state court receiver's opinion of Whitham's prospects for winning state court suit).

[35]  *See* Fed. R. Civ. P. 56(e)(1); Wright, Miller & Kane, 10B Fed. Prac. & Proc. Civil 3d § 2738 (2009) (". . . Rule 56(e) further limits the matter to be properly included in an affidavit to facts, and the facts introduced must be alleged on personal knowledge.  Thus, ultimate or conclusory facts and conclusions of law, as well as statements made on belief . . . cannot be utilized on a summary judgment motion.").

[36]  The Court notes that some of these uncontroverted facts are derived from the parties' requests for admission and are incorporated as stipulated facts in the final pretrial order.  *See* Adv. Dkt. 52, pp. 10-12.

8

lender, holding several notes executed by Sunbelt in 2006 and 2007, and extending a line of credit. Sunbelt's indebtedness was secured by nearly all of its property as collateral and the line of credit required it to submit monthly borrowing base certificates.

Whitham is a Colorado limited partnership and operates a feedyard near Leoti, Kansas. Stewart Whitham is the general partner. For a period of more than one growing season, Whitham bought corn from Sunbelt for its feeder operations.

On April 27, 2007, Sunbelt issued a Merchandising Target Offer (MTO) proposing to sell to Whitham or any other taker seven 100,000 bushel lots of corn at prices to be calculated based upon the futures market at the Chicago Board of Trade (CBOT or Board). Under the rather sparsely-worded terms of the offer, each lot would be sold at a price per bushel equal to a certain price quoted on the Board for future grain, plus a mark-up. As an example, the MTO offered 100,000 bushels of corn for delivery in December of 2007 to be priced at "23 H." This means that corn delivered in that lot would be priced at the Board's May, 2008 futures price plus 23 cents. The MTO set out the months in which each lot would be available for delivery. The parties' understanding was that as Whitham needed grain, it would arrange specific delivery dates within the months specified on the MTO.

Whitham offered to buy five of the seven lots (500,000 bushels) at the offered prices. These purchases were confirmed by Confirmation of Sale and Purchase (CSP) forms executed by Karen Allen on behalf of Sunbelt and transmitted to Whitham. One CSP was executed for each of the five lots and each CSP was dated May 4, 2007.[37] Each CSP specified that the weight and grade of the corn would be determined at its destination and that the purchases would be prepaid on November

---

[37] Sunbelt did not have 500,000 bushels of corn on hand in its facilities on May 4, 2007.

9

1, 2007, prior to delivery to Whitham.[38]  Both the MTO and the CSPs provided that "NGFA Rules" would apply, referring to the National Grain and Feed Association Trade Rules.  The MTO provides a place for the drafter to circle either "delivered" or "FOB."  Neither term is circled on this particular MTO, but the parties agree that these were "delivered" contracts.  Factually, this means that Sunbelt was responsible for delivery to Whitham's place of business. As will be discussed in the legal analysis below, the parties differ as to the legal effect of that term.

On November 1, 2007, Whitham prepaid Sunbelt $2,099,750 for the five lots of corn to be delivered in the coming months.[39]  The delivery costs were included in the price term and in Whitham's prepayment.  Sunbelt deposited Whitham's check in its operating account at SSB which at that time had a balance of $2,727.33.  Upon deposit of Whitham's check, SSB swept Sunbelt's account and applied it to pay down Sunbelt's line of credit which had a balance of $1,662,000.[40] The parties disagree whether there was sufficient grain in Sunbelt's facilities to deliver to Whitham on November 1.  The Court observes that the exhibits attached in support of SSB's motion reference a "grain position book" among the books and records of Sunbelt.[41]  This book would apparently show how much corn was on hand on November 1, 2007 or any other given date.  Inexplicably,

_____

[38]  Adv. Dkt. 52, Stipulation ¶ A.

[39]  Adv. Dkt. 52, Stipulation ¶ B.

[40]  In addition, Sunbelt made several payments, drawn on its account, throughout the month of November to SSB and entities Wheatbelt Farms, Inc., Plains Feeders, Inc., or K&K Farming, Inc., as dual payees.  Kathy Shafer's brother, Keith Young, had an ownership interest in each of these entities.  These facts are immaterial in the absence of a showing that Kathy Shafer had any interest in these entities. *See* Whitham's Memorandum in Opposition, Adv. Dkt. 51, pp. 16-17, ¶s 17, 19-27.

[41]  *See* Shafer Depo., p. 155, l. 19-23.

10

Sunbelt's grain position book was not submitted by either party with their summary judgment materials.

On November 19, 2007, Whitham agreed to buy an additional 80,000 bushels of corn. Sunbelt confirmed that purchase with two more CSPs, each for 40,000 bushels, one for December 2007 delivery and the other for January 2008 delivery. Whitham prepaid $326,400 for this grain on November 20, 2007. Sunbelt also deposited this check in its operating account at SSB. Whitham received no bills of sale, warehouse receipts or other documents of title in connection with the corn for which it paid.[42] Likewise, Whitham was charged and paid no storage fees to Sunbelt for the corn Sunbelt agreed to sell to Whitham. Sunbelt bore the risk of loss associated with the corn until the corn was delivered to Whitham.[43]

On December 6, 2007, Kathy Shafer contacted James Arnold, president of SSB, and requested a prompt meeting. At that time, she reported to him that Sunbelt had suffered considerable monetary losses because of its hedging practice. This was the first time that Shafer had so advised SSB and Arnold confirms in his affidavit that this was when SSB first learned that Sunbelt was "out of position." Sunbelt had not timely provided its borrowing base certificates to SSB for three months prior. As a result of Shafer's revelation, Sunbelt was in default of the terms and conditions of its loans and SSB closed Sunbelt's line of credit the next day, December 7.

On December 14, 2007, SSB commenced a state court foreclosure proceeding in the District Court of Greeley County, Kansas, asserting a security interest in Sunbelt's grain inventory. On that same date, the state grain inspector conducted an inspection of Sunbelt's grain inventory. The state

---

[42] Adv. Dkt. 52, Stipulation ¶s D and E.

[43] Adv. Dkt. 52, Stipulation ¶ F.

11

grain inspector's report is not part of the summary judgment record before the Court. Sunbelt was forced to stop its December deliveries to Whitham after delivering only 57,000 bushels of the 580,000 bushels contracted for.[44] In January 2008, the Kansas Department of Agriculture commenced a state court receivership action against Sunbelt and the state court appointed Terry D. Criss, Esq., as receiver to take control of the assets.

On February 4, 2008, SSB, in concert with two other petitioners, commenced an involuntary bankruptcy petition against Sunbelt, and an order for relief was entered on March 5, 2008, resulting in the appointment of a chapter 7 trustee, Steven Speth, to administer and liquidate Sunbelt's assets, and a stay of the state court cases.

In its opposing memorandum, Whitham set out 41 additional facts, nearly all of which are controverted by SSB. Those facts are largely supported by the same flawed affidavit Whitham used to controvert SSB's facts. Nonetheless, Whitham's additional "facts" may be summarized as follows. Whitham asserts in a conclusory fashion that over a period of 18 to 20 years, it and Sunbelt engaged in a course of dealing pursuant to which Whitham would bid for and buy corn in advance, pay for it, and take title to it immediately upon payment. Sunbelt would hold Whitham's corn after payment as a courtesy to Whitham and deliver it to the feedyards when and as Whitham requested. Whitham asserts that over the 18-20 year period, neither party observed or considered themselves bound by the NGFA rules. Whitham further claims that on December 14, 2007, according to statements attributed to Kathy Shafer and Karen Allen, another Sunbelt employee, after the state grain inspector's "full inspection of all the commodities of Sunbelt," sufficient grain was present

---

[44] Sunbelt did not deliver any corn to Whitham under the CSPs that provided for delivery of corn in January, February, March and April of 2008. Adv. Dkt. 52, Stipulation ¶ C.

12

in Sunbelt's inventory on December 14, 2007.[45]  Unfortunately, Whitham fails to provide the inspector's report to the Court.   Thus, this "fact" is not based upon personal knowledge, lacks foundation with respect to the state grain inspector, contains inadmissible hearsay, and contains matter outside the record before this Court.  In addition, Whitham's statement does not speak to whether there was sufficient grain on hand in Sunbelt's inventory on the date of Whitham's prepayment – November 1, 2007.[46]  The Court cannot find as uncontroverted fact that Sunbelt did have sufficient grain on hand as of November 1, 2007 to fulfill Whitham's contract.

Whitham's course of dealing contentions are the sole basis for many of its statement of uncontroverted "facts."[47]  These contentions are untenable for several reasons.  First, the 18-20 year period referenced by Whitham encompasses an alleged course of dealing with Sunbelt's predecessor, Sunbelt Grain, Inc.  Kathy Shafer's father, Vaughn Young, was the principal of Sunbelt Grain. Kathy and Jim Shafer formed the Sunbelt LLC in 2006 after they bought out Sunbelt Grain.  The Court is not convinced that Whitham's alleged course of dealing with Sunbelt Grain, a distinct business entity, is material to the transactions between Whitham and Sunbelt.

Second, Whitham's affidavit avers a course of dealing in a generic and conclusory fashion. Whitham does not set forth specific facts demonstrating a course of dealing.  Whitham's affidavit does nothing more than express Whitham's personal understanding of the terms of the CSPs and does not set forth any underlying facts that show his understanding was shared by Sunbelt, based

---

[45]  Adv. Dkt. 51, p. 19, ¶ 34.

[46]  Nor is the alleged fact "[o]n November 1 and 20, 2007, there was no question that the corn was on hand at Sunbelt's facilities," properly supported by Whitham's personal knowledge. Rather, the only support is Whitham's bald affidavit. *See* Adv. Dkt. 51, p. 15, ¶ 10.

[47]  *See* Adv. Dkt. 51, pp. 13-20.

13

upon the parties' repeated conduct.[48] Whitham's affidavit falls far short in supplying the evidentiary predicate for a course of dealing.

Third, and most significant, Whitham seeks to alter or vary the terms of the 2007 CSPs (including the application of the NGFA rules) by introduction of this alleged course of dealing. Because this contract involves the sale of goods, the parol evidence rule as codified in Article 2 of the UCC applies rather than the Kansas common law parol evidence rule.[49]  Even applying this more liberal parol evidence rule, course of dealing would only be admissible to *explain* a contract term, not to contradict, alter or vary the existing term.[50]  Here, the CSPs are clearly and expressly made subject to the NGFA rules.  Use of an alleged course of dealing to write out the NGFA rules is an attempt to vary or alter this term.  Where the course of dealing conflicts with a clear and

---

[48]  *See* KAN. STAT. ANN. § 84-1-303(b) (2008 Supp.) defining course of dealing as "a *sequence of conduct* concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a *common basis of understanding* for interpreting their expressions and other conduct."

[49]  KAN. STAT. ANN. § 84-2-202(a) (2008 Supp.); *School-Link Technologies v. Applied Resources,* 471 F. Supp. 2d 1101, 1111 (D. Kan. 2007).

[50]  § 84-2-202(a).  *See Aero Consulting Corp. v. Cessna Aircraft Co.,* 867 F. Supp. 1480, 1489-90 (D. Kan. 1994).  As explained in the Official UCC Comment to § 2-202, the UCC parole evidence rule does not first require a determination that the contract is ambiguous before the extrinsic evidence of course of dealing is admissible.  *See Barbara Oil Co. v. Kansas Gas Supply Corp.,* 250 Kan. 438, 452-53, 827 P.2d 24 (1992) (UCC parol evidence rule permits course of dealing evidence to explain or supplement terms even where the written contract is unambiguous). *See also, Adams v. Allstate Ins.,* 723 F. Supp. 111 (E.D. Ark. 1989) (Affidavit containing parol evidence to contradict a judicial document [Court Clerk's Report of Judicial Sale] is inadmissible and would not be considered in opposing insurer's summary judgment motion.); *Harris v. Siegel*, 438 F. Supp. 510 (D.C. Fla. 1977) (Parol evidence of an alleged oral side agreement between mortgagees and mortgagors that contradicted terms of note and mortgage would not be considered on summary judgment motion.).

14

express term, the express term controls.[51]  Finally, the fact that there may be differing interpretations of a contract's provisions does not present issues of fact precluding summary judgment where the contract is complete and unambiguous.[52]

Whitham further asserts that the CSPs were not honored because SSB commenced its legal action, doing so only after it had honored checks written on Sunbelt's account to several farming entities that were indebted to SSB and operated by relatives of Kathy Shafer.  The Court considers these facts, and the statement in Whitham's affidavit about what the state court receiver told him to be immaterial.  This Court does not question that when the Bank foreclosed on Sunbelt, Sunbelt lost its ability to perform these contracts, and that Whitham was forced to obtain a corn supply from an alternative source.  Similarly, when the Bank commenced the involuntary bankruptcy case, Sunbelt acquiesced and converted the case to a voluntary chapter 7 case, resulting in this Court appointing a trustee who, with the assistance of the receiver, took possession and control of the assets and liquidated them in an orderly fashion.  The Court concludes that this process prevented Sunbelt from performing Whitham's contracts.

Analysis

The fundamental legal issues here are (1) whether Sunbelt retained title to the grain destined for Whitham's feedyard when Whitham prepaid on November 1 and 20, 2007; and (2) whether SSB's claim is susceptible to equitable subordination because of its conduct.  Resolving these issues requires the Court to address some preliminary legal questions.  First, the Court must determine the

_____

[51]  KAN. STAT. ANN. § 84-1-303(e) (2008 Supp.) (express terms control over course of dealing where express terms and course of dealing cannot be reasonably construed as consistent with each other).

[52]  *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1007, 974 P.2d 569 (1999).

legal effect of the delivery contracts.  Second, the Court must determine whether the "gap-fillers" in Article 2 of the Uniform Commercial Code (UCC) or the NGFA Rules, or both, define the rights of the parties here.  Third, the Court must decide whether the uncontroverted facts in this record would support a finding of the requisite unfairness or misconduct necessary to subordinate SSB's secured claim to Whitham's unsecured claim.

### A.    Delivery Contracts

Even though the MTO does not designate whether the contracts are "delivery" or "FOB," the parties agree that Sunbelt was to deliver the grain to Whitham when Whitham directed delivery. Delivery charges were included in the price.  The CSPs specify that both weight and grade of the grain were to be determined at destination.  As adopted in Kansas, UCC § 2-308, provides that "unless otherwise agreed," the point of delivery is presumed to be at seller's place of business.[53]  By contrast, the NGFA Rules provide that "truck grain" shall be "considered to have been delivered at the time and date of unloading as evidenced by a scale ticket or dock receipt *issued by the receiving facility*."[54]  The Court concludes that delivery was to occur at Whitham's facility.

### B.    NGFA Rules

The contract clearly specifies that NGFA Rules will apply.  Whitham's attempt to contradict or vary this term with "course of dealing," as discussed above, is unpersuasive.[55]  The written contract clearly expresses application of the rules to the parties' transactions.  In any event, the

---

[53] KAN. STAT. ANN. § 84-2-308(a) (1996).

[54] Rule 30(D)(2), NGFA Grain Trade Rules (hereafter "NGFA"), authenticated copy of which is attached as Exhibit H to Adv. Dkt. 40, SSB's Memorandum in Support of Summary Judgment.

[55] *See* pp. 13-15, *supra.*

pertinent NGFA rules are not much different from the general provisions of Article 2 governing contracts for the sale of goods.

Article 2 codifies a parol evidence rule that honors the provisions of written agreements and protects them from contradiction by extrinsic evidence of a previous or contemporaneous oral agreement. KAN. STAT. ANN. § 84-2-202 (2008 Supp.) provides that a written agreement may be "explained or supplemented" by course of dealing and by evidence of consistent additional terms unless the court determines the writing to have been intended as a complete and exclusive statement of the agreement's terms. Here, both parties assented to the terms of the MTO and CSPs. Although a Whitham signature is lacking, KAN. STAT. ANN. § 84-2-201(2) (1996) provides that, between merchants, a confirmation that is sufficient against the sender and received is binding on both parties unless the recipient objects ten days after receiving the written confirmation. Thus, the CSPs are binding on the parties. Indeed, Whitham relies on them to support its claim to the grain.

Because both the MTO and the CSPs reference the NGFA rules, the Court concludes that they govern this transaction. Nothing in Whitham's affidavit supports a conclusion otherwise. His largely conclusory statements that, over the years, neither party had reason to reference these rules and that they only became relevant when brought to Kathy Shafer's attention during her deposition in this case, do not reference a course of dealing that "explains" the contract. Rather, these statements directly contradict an otherwise enforceable term of the agreement and the parol evidence rule contained in § 84-2-202 precludes admission of such contradictory extrinsic evidence. On this record, the Court concludes that the NGFA rules do apply.

NGFA Rule 3 provides for a confirmation process similar to that outlined in Article 2, KAN. STAT. ANN. § 84-2-201(2). If one party fails to send the other a written confirmation, the non-

17

confirming party is deemed to have agreed to the terms contained in the most recent confirmation.[56] Thus, under either the UCC or the NGFA, these confirmations, read with the MTO, are binding agreements. These agreements provide for the purchase by Whitham and delivery of the 100,000 lots of grain in various months through the winter of 2007-2008. Each CSP specifies a month for delivery and the parties agree that actual delivery dates were to be determined by Whitham based upon its need for the grain in its operations. That circumstance is a good example of admissible parol evidence that explains the written contract terms.

        C.    <u>Ownership</u>

The core issue here is when or if Whitham became the owner of the contracted corn. SSB argues that, according to NGFA rules and the contract's terms, Sunbelt retained the risk of loss and, therefore, an ownership interest in the grain until it was delivered. Whitham says that it owned the grain immediately upon prepayment, notwithstanding any rules or other provisions because that was the parties' course of dealing over many years' time. This matters because, if Sunbelt retained ownership of the grain, the after-acquired property clause in SSB's security agreements attached its security interest to the grain, giving it a prior interest to that of Whitham. If Whitham took ownership when it prepaid, it could claim that, as a purchaser in the ordinary course, its interest in the grain trumps SSB's security interest. The Court notes that it is undisputed that Whitham received no bills of sale or warehouse receipts for the corn it agreed to purchase from Sunbelt, that Sunbelt did not charge storage fees to Whitham for the corn it agreed to sell Whitham, and that Sunbelt bore the risk of loss for corn that is the subject of the CSPs until it was delivered to

---

[56] NGFA Rule 3(B) requires the non-confirming party (Whitham) to immediately notify the confirming party (Sunbelt) of any dispute with the terms of the CSPs.

Whitham.[57]  In short, no documents of title are before this Court showing Whitham's ownership of any corn under the CSPs at any time.

Deciding this pivotal question of ownership is complicated by the ongoing factual dispute concerning whether there was sufficient grain on hand on the May 4, 2007 and November 19, 2007 contract dates or on the November 1 and 20, 2007 prepayment dates.[58]  Whitham relies heavily on the explicit terms of the parties' agreement being subject to interpretation in light of the historical course of dealing between Sunbelt and itself.  As noted above, terms in a writing may be explained or supplemented, but not contradicted, by evidence of a course of dealing.[59]  The express terms of an agreement and the parties' course of dealing shall be construed as consistent where reasonable, but when they cannot, the express terms of the writing control.[60]  Among the express terms of the writing is, as noted above, a specific reference that reads into the CSPs the NGFA Rules.

Keeping these baseline principles in mind, the Court applies the law governing the passage of title under Article 2 to the explicit terms of the contract which, when contradicted by a purported course of dealing, take precedence.  The Court cannot conclude as a matter of uncontroverted fact that there was sufficient grain on hand to honor the contracts either in May or November of 2007.  The only record support for concluding otherwise is found in Whitham's affidavit and is based

---

[57]  *See* SSB's Uncontroverted Fact ¶s 42-45.

[58]  The CSPs for the five lots of 100,000 bushels each, were issued May 4, 2007 and were prepaid on November 1, 2007.  The CSPs for an additional 80,000 bushels were issued November 19, 2007 and prepaid on November 20, 2007.  It is undisputed that Sunbelt did not have 500,000 bushels of corn on hand in its facility at the time the May 4 CSPs were issued. *See* SSB Uncontroverted Fact ¶s 25-26; Shafer Depo. pp. 33-34, 44, 51-52.

[59]  KAN. STAT. ANN. § 84-2-202(a) (2008 Supp.).

[60]  KAN. STAT. ANN. § 84-1-303(e) (2008 Supp.).

essentially on hearsay, Whitham's characterization or interpretation of statements attributed to others, or Whitham's own conclusory understanding. None of the statements in Whitham's affidavit are based on personal knowledge regarding the quantity of corn on hand at Sunbelt's facility available to fulfill the Whitham contracts at the time of prepayment in November 2007.[61]

The only other evidentiary basis concerning the quantity of corn on hand in November of 2007 is the deposition testimony of Sunbelt's Kathy Shafer. SSB cites to her testimony as support for the proposition that Sunbelt did not have a sufficient quantity of corn on hand at Sunbelt's facility to satisfy the CSPs at the time of Whitham's prepayment.[62] Whitham attempts to controvert that fact with other references to Shafer's testimony where she could not state the precise quantity of corn on hand at certain times and with quantities that were on hand on dates other than November 1, 2007.[63] In its additional statements of uncontroverted fact, Whitham again alleges, based solely upon the Whitham affidavit, that a sufficient quantity was on hand at the time of prepayment.[64] This alleged fact is not properly supported by an affidavit made upon personal knowledge. Moreover, Whitham has not come forward with the key piece of evidence to refute Shafer's testimony and to support its factual contention – the grain position book maintained by Sunbelt. Shafer testified that the grain position book would identify the quantity on hand in Sunbelt's facilities at any given point in time, including that portion of the grain that was open-storage grain belonging to producers and

---

[61] *See* Whitham Affidavit ¶s 11, 35, 42.

[62] *See* Adv. Dkt. 40, Fact No. 33, Shafer Depo., p. 155.

[63] *See Adv.* Dkt. 51, p. 9.

[64] *See* Adv. Dkt. 51, p. 15, Fact No. 10, stating: "On November 1 and 20, 2007, there was no question that the corn was on hand at Sunbelt's facilities."

the portion of grain to fulfill contracts with buyers other than Whitham.[65]  Thus, the Court cannot

find as uncontroverted fact that there was a sufficient quantity of corn on hand in November when

Whitham prepaid for Sunbelt to fulfill the contracts (580,000 bushels) and therefore, Sunbelt's

commitment to sell to Whitham related to "future goods" as that term is employed in Article 2.[66]

The status of goods as "existing" or "future" can affect the manner in which title to those

goods passes.  Section 2-401 provides that Article 2's provisions apply without regard to the title of

those goods "except where the provision refers to such title."[67]  In situations not covered by the other

provisions of the article, and where title becomes material, KAN. STAT. ANN. § 84-2-401 sets out

several rules governing its passage.  The basic rule, found in § 84-2-401(1), provides that title cannot

pass under a contract for sale until the goods are identified to the contract under § 2-501.  Unless it

is otherwise explicitly agreed, when the goods are identified to the contract, the buyer acquires a

"special property."[68]  Section 84-2-401(2)(b) states that unless the parties have otherwise explicitly

agreed, title passes to the buyer at the time and place where seller completes performance and if that

performance requires delivery at destination (as it did here), title passes at the goods' destination.

---

[65]  *See* Shafer Depo., pp. 153, 155.  The Court is mindful that not all grain at Sunbelt's facilities was available to fulfill the Whitham contracts.  For example, some portion of the grain on hand belonged to producers who stored the grain at Sunbelt under an open storage arrangement.  The Court received no evidence of what proportion of the grain on hand on the November prepayment dates was open storage grain.  Likewise, Sunbelt had grain at its facility to fulfill sales contracts with other buyers.  The grain position book of Sunbelt, not made available to the Court, would show the amount of grain on hand on any given day and how much of that was producer-owned grain.  *See* Shafer Depo., pp. 134-39, 161-162.

[66]  KAN. STAT. ANN. § 84-2-105(2)(1996) provides that goods which are not both "existing" and "identified" are future goods.

[67]  KAN. STAT. ANN. § 84-2-401 (2008 Supp.).

[68]  KAN. STAT. ANN. § 84-2-401(1) (2008 Supp.).

Was this corn identified to Whitham's contract?  Section 84-2-501 provides that the buyer obtains "a special property and an insurable interest" by identifying *existing* goods in any manner and at any time as the parties explicitly agree.[69]  Here, the parties' agreement reads in the NGFA rules and, under NGFA Rule 6, title and the risk of loss as to trucked grain passes when the grain arrives at the buyer's facility.[70]  Thus, the CSPs contain an explicit agreement governing title passage that dovetails nicely with § 84-2-401(2).    If, as SSB argues, the corn on hand was insufficient to fulfill the contract, § 84-2-501 provides essentially the same result.  It states:

> *In the absence of explicit agreement* identification occurs . . . (b) if the contract is for the sale of future goods other than those described in paragraph (c) [growing crops or livestock young], when goods are shipped, marked, or otherwise designated by the seller . . . .[71]

Here, the contract explicitly treats the passage of title by incorporating NGFA Rule 6 and the Court need not turn to § 2-501(b) to replace that term.[72]  If there were insufficient goods to fulfill the contract when Whitham paid in advance on November 1, title in the corn did not pass at that time.  As Sunbelt retained title to what corn it had, SSB's security interest attached to it.[73]

KAN. STAT. ANN. § 84-2-105(2) (1996) provides that the goods must be both existing and

---

[69] KAN. STAT. ANN. § 84-2-501 (1996).

[70] NGFA Rule 6(B)(2).

[71] KAN. STAT. ANN. § 84-2-501 [Emphasis added].

[72] In any event, Kansas law on identification of goods requires an intent to identify *particular* goods and *some overt act* manifesting that intent, such as loading the corn on the trucks and sending the trucks to their destination, Whitham.  *See Reeves v. Pillsbury Co.,* 229 Kan. 423, 428, 625 P.2d 440 (1981) (identification ordinarily occurs by seller filling an order).

[73] Even if the corn was identified to the contract as Whitham contends, it does not follow that title passed at the moment of identification.  As noted in *Reeves, supra* at 429, the question of identification of goods to a contract and the passing of title are separate questions.  Title does not pass with identification where the seller has not completed delivery.

identified in order for an interest in them to pass. Goods that are not both existing and identified are "future goods." A present sale of those goods "operates as a contract to sell." Thus, the corn contracted by Whitham, but not owned by Sunbelt at the contract or payment date, constituted "future goods" and Sunbelt's agreement to sell it to Whitham was a contract to sell. In the instant that Sunbelt acquired ownership of those goods, SSB's security interest attached to them and would continue to encumber them until the corn was delivered to Whitham.[74]

As to the funds Whitham paid in advance, SSB's security agreement attached all of Sunbelt's accounts receivable and deposit accounts. In short, nothing in the facts or in the law supports Whitham's claim that "course of dealing" somehow passed title to the buyer upon Whitham's prepayment in November. To conclude that, this Court would have to ignore the plain meaning of the writings on which the sale is based and accept Whitham's contradiction of their terms. Doing so would flaunt Article 2's rules of integration and interpretation.

The Court concludes that, as a matter of law, SSB is entitled to judgment that its security interest in Sunbelt's corn and accounts takes priority over Whitham's unsecured claim for corn contracted and not delivered.

D.     Equitable Subordination[75]

---

[74] *See* KAN. STAT. ANN. § 84-9-203(a) and (b)(2) (2008 Supp.) (Stating that a security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral and including among elements for enforceability that debtor has rights in the collateral).

[75] *See* 11 U.S.C. § 510(c). The Court questions whether Whitham may assert equitable subordination by way of defense to SSB's cross-claim. Fed. R. Bankr. P. 7001(8) requires that an action to subordinate claims be brought as an adversary proceeding, suggesting that it is an affirmative claim for relief that must be pled. In addition, some courts hold that the chapter 7 trustee is the proper party to seek subordination. *See Bezanson v. Bayside Enterprises, Inc. (In re Medomak Canning)*, 922 F.2d 895, 902 (1st Cir. 1990) (Trustee is appropriate party to seek

Drawing all reasonable inferences against SSB, the Court finds for this motion's purposes that SSB had some reason to be aware of Sunbelt's distress before December of 2007. Sunbelt had failed to timely file its borrowing base reports for three months. The Court also finds that SSB swept funds from Sunbelt's accounts on November 1, 2007, immediately after Whitham's prepayment was deposited.[76] SSB's $1.6 million sweep, added to Sunbelt's payment of various producer entities for grain sold to the elevator, totaled approximately $2.07 million, expending near the full amount of Whitham's prepayment ($2,099,750). Other than the familial relationship between Shafer and one of the owners of these entities, nothing in the record suggests that the producers were "related" or "affiliated" with Sunbelt or SSB. There is no evidence in the record suggesting any misconduct or meddling on the part of SSB by which it exerted control over Sunbelt. Indeed, the record suggests nothing more than SSB's apparent exercise of its rights under its loan documents with both Sunbelt and these other producer entities.[77] The Court notes in this connection

equitable subordination on behalf of unsecured creditors; unsecured creditor may assert equitable subordination only when trustee has refused to do so and court grants unsecured creditor leave to assert the claim). Notwithstanding the questionable procedural posture in which Whitham has raised equitable subordination, the Court will consider the merits of Whitham's equitable subordination theory.

[76] After that $1.6 million sweep, however, further advances were made on Sunbelt's line of credit. *See* Ex. 2 attached to Whitham's summary judgment papers.

[77] Subordination claims against secured lenders such as SSB have generally been rejected when the secured creditor is simply enforcing its rights, even though the exercise of those rights may be detrimental to other creditors. Hon. William L. Norton, Jr. and William L. Norton III, 3 NORTON BANKRUPTCY LAW & PRACTICE § 53:4 (3RD ED, Thomson/West 2008). *See United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re U.S. Abatement Corp.),* 39 F.3d 556 (5th Cir. 1994) (creditor Mobil exercised contractual right to be indemnified by debtor and asserted unsecured claim to recoup sums from debtor it became obligated to pay to debtor's subcontractors; Mobil's claim was not subject to equitable subordination); *Smith v. Associates Commercial Corp. (In re Clark Pipe & Supply Co.),* 893 F.2d 693 (5th Cir. 1990) (Lender's reduction of debtor's revolving line of credit as permitted by the loan agreement was insufficient to invoke equitable subordination).

that no deposition testimony of any lending officer is offered by Whitham and that all of its factual support for this claim comes from the Stewart Whitham affidavit which, as SSB notes, is largely grounded in hearsay, innuendo, and Whitham's characterizations and conclusory statements.

Some finding of wrongdoing or inequitable conduct is a necessary predicate to equitable subordination.[78]  The Tenth Circuit looks to a three-part test to determine when subordination is appropriate –

(1)     The claimant has engaged in inequitable conduct;

(2)     The conduct has injured creditors or given an unfair advantage to claimant; and

(3)     Subordination is not inconsistent with the Bankruptcy Code.[79]

In short, Whitham needed to produce some basis for a finding that SSB engaged in fraud, breached its fiduciary duty or controlled the debtor.[80]  As the Tenth Circuit has stated, a non-insider creditor generally owes no fiduciary duty to the other creditors of a debtor and must be found to have engaged in specific conduct that gave rise to such a duty.[81]  The degree of wrongful conduct necessary to predicate an equitable subordination claim has been described as "egregious," "gross

_____

[78]  The doctrine of equitable subordination looks to behavior of the parties involved. *In re Hedged-Investments Associates, Inc.,* 380 F.3d 1292 (10th Cir. 2004).  The *Castletons* court called inequitable conduct on the part of the party whose claim is sought to be subordinated as "the critical inquiry." 990 F.2d at 559.

[79]  *Sloan v. Zions First National Bank (In re Castletons)*, 990 F.2d 551, 559 (10th Cir. 1993); *In re Hedged-Investments Associates, Inc.*, 380 F. 3d 1292, 1300 (10th Cir. 2004).

[80]  *See In re Hedged-Investments Associates, Inc., supra* at 1301 (The categories of "inequitable conduct" necessary to support an equitable subordination claim are (1) fraud, illegality and breach of fiduciary duty; (2) undercapitalization; or (3) use of debtor as mere instrumentality or alter ego).  Neither the second or third categories is at issue in this case.

[81]  *Carter-Waters Oklahoma, Inc. v. Bank One Trust Co., N.A. (In re Eufaula Industrial Authority)*, 266 B.R. 483, 489 (10th Cir. BAP 2001).

25

misconduct tantamount to fraud, misrepresentation, overreaching or spoliation."[82]

Whitham points to nothing in the record supporting this level (or any level) of wrongdoing on the part of SSB. SSB is entitled to judgment as a matter of law on Whitham's equitable subordination claim.

<u>Conclusion</u>

Consistent with the forgoing, SSB's motion for summary judgment should be granted and judgment entered for SSB on the trustee's adversary complaint, finding that SSB's perfected security interest in Sunbelt's assets entitles it to a priority claim against the grain and its proceeds superior to the unsecured claim of Whitham. A judgment on decision will issue this day.

# # #

---

[82] *In re Castletons, supra* at 559; *In re Hedged-Investments Associates, Inc., supra* at 1301-02.

Case 08-05112    Doc# 54    Filed 06/18/09    Page 26 of 26